## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NISHAWN GREEN and DEMETRIUS LABON, ) ) ) ) | |
| Plaintiffs, ) ) | Case No. _____ |
| v. ) ) ) | |
| BRIAN D. COLLINS, ROBERT ) GARZA, RYAN J. STEC, ARNOLDO ) RIVERA, JOEL SOTO, JOHN ROES ) 1-5, and the CITY OF CHICAGO, ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) ) | |

NOW COME Plaintiffs Nishawn Green and Demetrius Labon, by their attorneys and

complaining of defendants BRIAN D. COLLINS (star # 16773), ROBERT GARZA (star #

1105), RYAN J. STEC (star # 8651), ARNOLDO RIVERA (star # 16152), JOEL SOTO (star #

19351), JOHN ROES 1-5, and the CITY OF CHICAGO, state as follows:

### NATURE OF THE CLAIM

1.      Members of the Chicago Police Department raided the home of siblings Nishawn

Green and Demetrius Labon without a valid search warrant.  Then, once the police realized that

they were in the wrong place—the dwelling they meant to search was an entirely separate

apartment in the same building—they did not retreat from Plaintiffs' home.  Instead, the police

treated Demetrius and Nishawn like criminal suspects, holding them up against their own kitchen

wall for two hours while officers searched the other, separate apartment.

2.      This misconduct violated Demetrius and Nishawn's right to be free of unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States constitution, as well as their rights under the common law.

3.      Demetrius and Nishawn bring this action pursuant to 42 U.S.C. § 1983 and the laws of the State of Illinois to redress injuries they suffered as a result of this misconduct.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because the events giving rise to the state law claims form part of the same case and controversy as the claims over which the Court exercises original jurisdiction.

3.      Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this litigation occurred in the Northern District of Illinois.

## PARTIES

5.      Plaintiff Nishawn Green is 24 years old.  She lives with her brother, Demetrius, at 2111 S. Drake Avenue, Apartment 1F, in Chicago.

6.      Plaintiff Demetrius Labon is 22 years old.  He lives with his sister, Nishawn, at 2111 S. Drake Avenue, Apartment 1F.

7.      Defendant BRIAN COLLINS (star # 16773) is a member of the Chicago Police Department.  COLLINS swore out the Complaint for Search Warrant upon which the search warrant at issue in this case was based.  COLLINS was also a member of the police team that executed the search warrant at issue in this case.

8.      Defendant ROBERT GARZA (star # 1105) is a member of the Chicago Police Department.  GARZA was the supervising sergeant of the police team that executed the search warrant at issue in this case.

9.      Defendant RYAN STEC (star # 8651) is a member of the Chicago Police Department.  STEC was a member of the police team that executed the search warrant at issue in this case.

10.     Defendant ARNOLDO RIVERA (star # 16152) is a member of the Chicago Police Department.  RIVERA was a member of the police team that executed the search warrant at issue in this case.

11.     Defendant JOEL SOTO (star # 19351) is a member of the Chicago Police Department.  SOTO was a member of the police team that executed the search warrant at issue in this case.

12.     Defendants JOHN ROES 1 through 5 are members of the Chicago Police Department.  They are sued herein by fictitious names because their true names are unknown to Plaintiffs.  Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these ROE defendants when their identities have been ascertained.  Plaintiffs are informed and believe, and based thereon allege, that these fictitiously-named ROE defendants are responsible in some manner for the misconduct alleged herein.

13.     The CITY OF CHICAGO is an Illinois municipality.  It operates the Chicago Police Department, which employs of all the individual defendants.

## FACTS

### Layout of 2111 S. Drake Avenue

14.     2111 S. Drake Avenue is a two-story greystone apartment building in Chicago. The building has five apartments:  one unit (Apartment G) is a garden unit and is the only apartment on the basement/garden level.  The building's first and second floors each have two apartments in a front-rear arrangement, such that the first floor has apartments "1F" and "1R" and the second floor has apartments "2F" and "2R."

15.     The five apartments are accessed through several different entrances.  The front door of the building, facing Drake Avenue, opens onto a small vestibule, which in turn has two other doors.  The door on the left opens onto stairs leading up to Apartment 2F, and is labeled with a "2."  The door on the right is the front door of Apartment 1F, and is also labeled.  The "1" decal has fallen off, but the "F" decal remains, and is clearly visible.

16.     2111 S. Drake's garden (G) and rear (1R and 2R) apartments are accessed from a wide gangway running along the south side of the building.  There are two doors along the gangway.  The first door, down a flight of stairs, is for Apartment G, and is so labeled.

17.     The second door, which is halfway down the side of the building and up a flight of stairs, opens to another, side vestibule.  This side vestibule in turn has two doors:  the back door to Apartment 1F, and the front door to Apartment 1R.  The door to Apartment 1R is labeled "1R."  The side vestibule also has stairs leading up to the same arrangement on the second floor: the back door to Apartment 2F and the front door to Apartment 2R.

18.     While doors for Apartments 1F and 1R both open into the side vestibule, the two apartments are entirely separate units.  Indeed, as the police search of Apartment 1R would later reveal, Apartment 1R's door facing the side vestibule was barricaded with 2x4s.

19.     The rear of the building, facing an alley, has a two-story wooden deck-and-stairs arrangement, and has rear doors for apartments G, 1R, and 2R.  There are also five electrical meters, one for each apartment, on the rear wall of the building.

20.     That 2111 S. Drake has five apartments is made obvious by the five separate mailboxes attached to the building's front fence, along the sidewalk.  These mailboxes are variously labeled with apartment numbers and names of tenants, and are plainly visible to any person arriving at the building or passing by on the street or sidewalk.  Labels on two of the boxes (to apartments 1F and G) are missing or obscured, but the remaining mailboxes are plainly labeled "2F," "2R," and "1R," in large, reflective lettering.

21.     A plaque above 2111 S. Drake's front door prominently displays the name, address, and phone number of Letts Property Management, which manages the building.

**Collins obtains search warrant for "[t]he first floor apartment" of 2111 S. Drake**

22.     On February 7 or 8, 2017, COLLINS swore out a Complaint for Search Warrant for "the first floor apartment located at 2111 S. Drake."

23.     In the Complaint for Search Warrant, COLLINS relates that he was told by a "J. Doe" informant that J. Doe had gone to "the back door" of the first floor of 2111 S. Drake, where a man named "Pookie" answered, invited J. Doe into his kitchen just inside the back door, and sold J. Doe illegal drugs there.  (J. Doe had also seen other people come to this back door and apparently buy drugs.)  COLLINS goes on to state that he accompanied J. Doe to 2111 S. Drake, where J. Doe pointed the front and rear of the building and specifically identified the rear door of the first floor of the building, where J. Doe had entered to buy drugs.  The Complaint for Search Warrant also notes that J. Doe identified "Pookie" as a man named Darren Todd, age 45.  The Complaint for Search Warrant sought a search warrant to seize illegal drugs and other items in

5

Pookie's apartment. The Complaint for Search Warrant does not relate that COLLINS, or anyone else, made any effort to determine how many apartments were in the building, or whether the first floor had more than one apartment.

24.     On the afternoon of February 8, based on the allegations COLLINS made in the Complaint for Search Warrant, a search warrant was issued for the "First floor apartment of a two flat apartment building located at 2111 S. Drake Ave., Chicago, Il, Cook County, 60623."

**The defendants execute the search warrant on the wrong apartment**

25.     Nishawn and Demetrius reside in Apartment 1F of 2111 S. Drake, which is a three-bedroom apartment. From the building's front vestibule, Apartment 1F's front door opens into a living room. From the living room, a hallway leads past the first bedroom, and then to the kitchen. Doors from the kitchen open onto a bathroom and Demetrius and Nishawn's separate bedrooms, as well as the apartment's back door, which, as noted above, opens to the building's side vestibule.

26.     On the evening of February 8, 2017, Demetrius and Nishawn were home in for the evening. Demetrius was in the kitchen; Nishawn was in her bedroom. Around 7:30 p.m., Demetrius heard police banging on Apartment 1F's front door, announcing themselves loudly. He began moving towards the front door to answer, but never got past the kitchen threshold before the police broke down the door with a battering ram. Several officers rushed into the living room, with guns drawn. On information and belief, these officers included defendants COLLINS, GARZA, STEC, RIVERA, SOTO, and one or more ROES.

27.     As they entered the apartment one of the defendants broke down the door to the apartment's front bedroom, next to the living room. This action was entirely unnecessary: nobody was inside the first bedroom and its door, which locks from the inside, was unlocked.

28.     As they entered the apartment the defendants, some of whom were dressed in helmets and military-style assault gear, pointed their guns at Demetrius.  The lead officer, who also had a tactical shield, pointed a submachine gun at Demetrius and yelled at him to get on the floor.  Demetrius complied.  He was handcuffed behind his back, face down, on the kitchen threshold.

29.     The defendants then stepped over Demetrius and entered the kitchen.  Nishawn, wearing her night clothes, had just entered the kitchen from her back bedroom after hearing the commotion.  Pointing guns at Nishawn, the defendants ordered her to the kitchen floor as well.  She complied, and lay face-down on the kitchen floor.

30.     Plaintiffs told the officers that they were in the wrong apartment—they were not involved in any criminal activity.  The officers responded that they were there to search the rear of the building.  The siblings explained the layout of the building.  They explained that there were two apartments on the first floor, and that Apartment 1F's back door opened into the side vestibule, which also had a door for Apartment 1R.

31.     After receiving this information, the officers did not immediately retreat from Apartment 1F, and instead continued looking around the apartment.  During this time, the siblings repeatedly asked the officers why they were in their home, and demanded to see a search warrant.  The officers responded that they would provide the siblings with a search warrant, but they never did.

32.     Eventually, most of the defendants entered the side vestibule and applied the battering ram to the door of Apartment 1R.  After the defendants entered Apartment 1R, they searched it for approximately 2 hours.

33.     After deciding to search of Apartment 1R, however, the defendants did not retreat from Apartment 1F.  Instead, pursuant to an agreement and understanding among the defendants, and at the direction and with the knowledge and consent of supervisor GARZA, a male police officer (a "ROE" defendant) stayed behind while the other officers entered Apartment 1R, and remained in Demetrius and Nishawn's kitchen.  The ROE defendant ordered the siblings to stay up against their own kitchen wall.  He forced Nishawn and Demetrius to remain in that position for the duration of the approximately two hours it took the police to search Apartment 1R.[1] Nishawn was thus forced to stand in front of a male stranger in her bedclothes, for hours.

34.     Throughout this time, the siblings repeatedly asked the ROE defendant to explain why the police were in their home, and demanded to be provided with a copy of any search warrant that justified their presence in the home.  The ROE defendant did not respond, and did not produce a search warrant.

35.     Around 9:30 or 10:00 p.m. the police finished their search of Apartment 1R.  Only then did they also leave Apartment 1F, and allow Demetrius and Nishawn off the kitchen wall.  The defendants never presented the siblings with a search warrant or any other documentation of the raid.  They did not charge either Demetrius or Nishawn with any crime, suggest that they had ever been suspected of criminal activity, or suggest that they had ever been lawfully under arrest.

36.     The Plaintiffs suffered damages as a result of the search.  The front door to Apartment 1F was damaged, as was the door to the front bedroom, and items in their home were upturned as a result of the defendants' search of the apartment.

---

[1]  During this time Nishawn's stepfather, who had learned of the raid from a neighbor, repeatedly called Nishawn's phone to make sure that she and Demetrius were safe.  The ROE defendant briefly let Nishawn off the wall to answer the phone, which she had placed on the kitchen table when she was ordered to the floor.  He thereafter ordered her to return to the kitchen wall.

37.     The defendants' conduct of the raid was also severely emotionally damaging. Demetrius and Nishawn were in the sanctuary of their home for the evening when heavily armed, shouting men burst into their home and pointed assault weapons in their faces.  Such an event is terrifying enough on its own; it also placed Demetrius and Nishawn in reasonable fear that they might be killed if they made any inadvertent move that the defendants misinterpreted as threatening.

38.     The event was particularly traumatizing because Demetrius and Nishawn have been victims of gun violence.  Their mother was murdered several years ago, when the siblings were teenagers; Nishawn was the one who found her mother's body, shot to death in a car.  Being threatened by armed men at gunpoint during the unlawful entry and search of their home was traumatizing and emotionally damaging to both Demetrius and Nishawn.

39.     Demetrius and Nishawn were also humiliated by the invasion into their home, as well as by having strangers in their home who forced them to lie on their own floor and then to get up against their own kitchen wall, for hours, for no reason.

40.     Nishawn in particular was humiliated by being forced to stand in front of a male stranger in her nightclothes, in her own home, for hours.

41.     The individual defendants' acts and omissions described herein were objectively unreasonable.  They were also willful, wanton, malicious, oppressive, and done with reckless indifference and callous disregard for the rights of others, and justify the awarding of exemplary and punitive damages.

42.     In all the acts and omissions described herein, the individual defendants were acting within the scope of their employment for their employer, defendant the CITY OF CHICAGO.

## COUNT I

### 42 U.S.C. § 1983 - Invalid Warrant

43.     Each paragraph of this complaint is incorporated as if fully restated here.

44.     Before setting in motion a dangerous and terrifying militarized police raid, COLLINS had a duty to discover whether he was identifying the right place to be searched, and not the dwelling of some innocent third party.  He utterly failed to do this, resulting in precisely the kind of invasion of Demetrius and Nishawn's home that the Fourth Amendment is designed to prevent.

45.     When he swore out the Complaint for Search Warrant, COLLINS knew or should have known that there was more than one unit on the first floor of 2111 S. Drake, and that there was only probable cause to believe that the *rear* first floor unit, Apartment 1R, could be a proper target for any search.

46.     The information that COLLINS received from the J. Doe informant provided no information about whether or not the first floor of 2111 S. Drake contained more than one unit. Rather, J. Doe indicated only that he or she had entered Pookie's apartment from the building's rear, and that he or she had only entered the apartment as far as the kitchen, which was immediately inside the rear door.  J. Doe thus provided no meaningful information regarding whether the building's entire first floor was made up only of one unit, or more.  The limited nature of the information provided by the J. Doe informant should have prompted COLLINS to make further efforts to determine how many apartments were contained on the building's first floor.

47.     Furthermore, even a passing view of the front of the building (which COLLINS stated in the Complaint for Search Warrant that he had seen) would have alerted a reasonable

person that the first floor contained more than one unit. The mailboxes for 2111 S. Drake are clearly visible from the street and sidewalk, and there are five such mailboxes, indicating five apartments. The labeling of the "1R" mailbox, the "2F" and "2R" mailboxes, and the existence of the two additional unlabeled mailboxes, should have made it obvious to COLLINS that there were multiple units on each floor, and that in particular the first floor of the building, which evidently had a "rear" (*i.e.*, "1R") apartment, contained more than one unit. At a minimum, the mailboxes should have alerted COLLINS that he needed to determine whether the first floor of 2111 S. Drake contained one unit, or more.

48.     Likewise the presence of five utility meters on the rear of the building—which COLLINS stated he surveilled with the J. Doe informant—should also have alerted COLLINS that he needed to take some step to discover how many apartments were on the first floor, rather than simply assuming there was only one.

49.     Such an inquiry would have been easy for COLLINS to make. For one thing the "1R" mailbox was there for all to see, and in light of the information provided by J. Doe, it indicated that Pookie lived in an Apartment 1R. For another, if COLLINS had bothered to contact Letts Property Management, whose name, phone number, and contact information are prominently displayed above the building's front entrance, he would have learned that there were indeed two units on the building's first floor. In the same manner, COLLINS also could have contacted the utility companies and learned that there were two units on the first floor. Furthermore, the Chicago Police Department subscribes to information sources, like Accurint, that help officers identify apartments and persons residing in them. Had COLLINS bothered to use such an information source, he would have learned that 2111 S. Drake has two units on the first floor.

11

50.     COLLINS did not conduct any such investigation, however, or cause one to be conducted.

51.     Given the information available to him at the time he swore out the Complaint for Search Warrant, COLLINS either knew or should have known that the first floor of 2111 S. Drake contained more than one unit, and he should have disclosed that information to the magistrate issuing the search warrant.  He failed do this, however.

52.     COLLINS'S failure to discover and disclose that the first floor contained more than one unit was either intentional or reckless, and as a result the magistrate was misled into believing that there was probable cause to search the entire first floor of 2111 S. Drake, when in fact there was not.

53.     As a result, the February 8, 2017 warrant to search "the first floor" of 2111 S. Drake was invalid when it was issued.  There was no valid warrant to search Apartment 1F, and the search of that apartment was not conducted pursuant to a valid warrant.

54.     COLLINS'S acts and omissions were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others. They justify the awarding of exemplary and punitive damages.

55.     By reason of these acts and omissions, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and they suffered damages to their property, emotional injuries, and humiliation, as described in this complaint.  Therefore COLLINS is liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

## COUNT II

### 42 U.S.C. § 1983 – Illegal Entry into Apartment 1F and Unreasonable Seizure

56.     Each paragraph of this complaint is incorporated as if fully restated here.

57.     The individual defendants who executed the search warrant—COLLINS, GARZA, STEC, RIVERA, SOTO, and ROES 1-5—knew or should have known, prior to banging down Apartment 1F's front door, that the search warrant was invalid for not describing the place to be searched with particularity.

58.     The individual defendants executed the warrant by entering Apartment 1F's front door, through the front vestibule.  This required them to walk past the five mailboxes in the front of the building, including one labeled "1R."  Upon entering the building's vestibule, the defendants were confronted with a door clearly marked with an "_F."  Given that they knocked this door down pursuant to a warrant to search a first floor apartment, the defendants plainly understood that the blank in "_F" referred to "1F."  Either the 1R mailbox or the "_F" door marking should have alerted the officers that the search warrant did not describe the place to be searched with sufficient particularity.  For while the search warrant was for the "first floor apartment" of 2111 S. Drake, both the "1R" mailbox and the "_F" on the front door made it obvious that there was more than one apartment on the first floor.  Thus at the time they executed the search warrant by banging down Apartment 1F's door, the officers knew or should have known that the first floor of 2111 S. Drake contained more than one apartment.

59.     As soon as they knew or should have known that there was more than one unit on 2111 S. Drake's first floor, the individual defendants were put on notice of the risk that they might be entering a unit erroneously included within the terms of the search warrant.  Having been put on notice, the defendant officers were required to "discontinue" the search by not

13

entering into Apartment 1F in the first place. Yet they failed to do so, instead barging into the wrong apartment in a military-style raid and unreasonably seizing Demetrius and Nishawn in the process.

60.     This misconduct was willful, wanton, malicious, oppressive, objectively unreasonable, and done with reckless indifference and callous disregard for the rights of others, justifying the awarding of exemplary and punitive damages.

61.     By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and they suffered damages to their property, emotional injuries, and humiliation, as described elsewhere in this complaint.

62.     Therefore defendants COLLINS, GARZA, STEC, RIVERA, SOTO, and ROES 1-5 are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

## COUNT III

**42 U.S.C. § 1983 - Failure to Retreat from Apartment 1F and Unreasonable Seizure**

63.     Each paragraph of this complaint is incorporated as if fully restated here.

64.     After the individual defendants—COLLINS, GARZA, STEC, RIVERA, SOTO, and ROES 1-5—realized that they had incorrectly entered Apartment 1F and that in fact the target of the search warrant was Apartment 1R, they were obligated to retreat from Apartment 1F immediately.

65.     The individual defendants did not do this, however. Instead, at the direction and with the knowledge and consent of GARZA, the individual defendants agreed and conspired to have an officer remain in the Plaintiffs' home and force Demetrius and Nishawn to remain up

against the wall of their own kitchen, for the duration of the defendants' two-hour search of an entirely *separate* unit, Apartment 1R.

66.     And a male officer, defendant ROE, did so remain in Demetrius and Nishawn's kitchen, forcing them to stay against the kitchen wall in their own home, against their will, for hours.

67.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

68.     By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and they suffered humiliation and emotional injuries, which are described elsewhere in this complaint.  Therefore defendants COLLINS, GARZA, STEC, RIVERA, SOTO, and ROES 1-5 are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

## COUNT IV

### 42 U.S.C. § 1983 - Failure to Intervene

69.     Each paragraph of this complaint is incorporated as if fully restated here.

70.     In the manner described above, during the constitutional violations described herein, each of the individual defendants—COLLINS, GARZA, STEC, RIVERA, SOTO, and ROES 1-5—stood by without intervening to prevent the violation of the Plaintiffs' constitutional rights, even though they had an opportunity to do so.

71.     As a result of the individual defendants' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs suffered property damage, emotional

injury, and humiliation.  The individual defendants had ample, reasonable opportunities to prevent this harm, but failed to do so.

72.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

73.     By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution.  Therefore defendants COLLINS, GARZA, STEC, RIVERA, SOTO, and ROES 1-5 are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

## COUNT V

### State Law – Trespass

74.     Each paragraph of this complaint is incorporated as if fully restated here.

75.     Plaintiffs had a possessory right to Apartment 1F, including the right to exclude entry by others.

76.     Each of the individual defendants—COLLINS, GARZA, STEC, RIVERA, SOTO, ROES 1-5—intentionally made unauthorized entry, without permission, into Apartment 1F.

77.     The individual defendants also conspired and agreed to intentionally remain in Apartment 1F, without authorization, and one of the defendants, ROE, did so remain in Apartment 1F.

78.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

79.     All of the defendants committed these tortious acts and omissions in the course of their employment by defendant CITY OF CHICAGO, and the CITY OF CHICAGO is therefore liable for their acts under the doctrine of *respondeat superior*.

80.     Plaintiffs suffered injuries as a result of the trespass, as described elsewhere in this complaint.

## COUNT VI

### State Law - False Imprisonment

81.     Each paragraph of this complaint is incorporated as if fully restated here.

82.     As described more fully herein, the individual defendants—COLLINS, GARZA, STEC, RIVERA, SOTO, ROES 1-5—intentionally confined Nishawn and Demetrius, without authority, to boundaries not of the Plaintiffs' choosing.

83.     Demetrius and Nishawn did not consent to these restraints.  Rather they were impelled by the defendants' show of unfounded assertion of authority and implicit threat of violence.

84.     Demetrius and Nishawn were conscious of the confinement and were harmed by it, as described elsewhere in this complaint.

85.     The defendants' acts and omissions directly and indirectly resulted in the Plaintiffs' confinement.

86.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

87.     All of the defendants committed these tortious acts and omissions in the course of their employment by defendant CITY OF CHICAGO, and the CITY OF CHICAGO is therefore liable for their acts under the doctrine of *respondeat superior*.

## COUNT VII

### State Law – *Respondeat Superior*

88.     Each paragraph of this complaint is incorporated as if fully restated here.

89.     While committing the misconduct alleged herein, the individual defendants were employees of the CITY OF CHICAGO, acting at all times within the scope of their employment.

90.     Defendant CITY OF CHICAGO is liable as principal for all torts committed by its agents.

## COUNT VIII

### State Law – Indemnification

91.     Each paragraph of this complaint is incorporated as if fully restated here.

92.     Illinois law provides that public entities are directed to pay any judgment for compensatory damages for which employees are liable within the scope of their employment activities.

93.     All the individual defendant officers were employees of the CITY OF CHICAGO, acting at all relevant times within the scope of their employment in committing the misconduct described herein.


WHEREFORE, Plaintiffs Nishawn Green and Demetrius Labon respectfully request that this Court enter a judgment in their favor and against defendants BRIAN D. COLLINS, ROBERT GARZA, RYAN J. STEC, ARNOLDO RIVERA, JOEL SOTO, JOHN ROES 1-5,

and the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs

against each defendant, punitive damages against each of the individual defendants, and any

other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiffs Nishawn Green and Demetrius Labon hereby demand a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

**Nishawn Green**
**Demetrius Labon**

Dated: April 17, 2017


By: /s/ Stephen H. Weil
    *One of Plaintiffs' attorneys*

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
1713 W. School Street
Chicago, IL 60657
(312) 752-6046

*Attorneys for Plaintiffs Nishawn Green and*
*Demetrius Labon*