**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NISHAWN GREEN and DEMETRIUS LABON, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 17-cv-2881 |
| BRIAN D. COLLINS, ROBERT GARZA, MICHAEL J. BARZ, RYAN J. STEC, ARNOLDO RIVERA, JOEL SOTO, DANIEL M. COJOCNEAN, MARK R. BRONKE, CARLOS R. RUIZ, NICHOLAS E. NUNEZ, MICHAEL T. FIETKO, and the CITY OF CHICAGO, | ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## AMENDED COMPLAINT

NOW COME Plaintiffs Nishawn Green and Demetrius Labon, by their attorneys and complaining of the above-named defendants, state as follows:

## NATURE OF THE CLAIM

1.      Members of the Chicago Police Department conducted a needlessly violent raid on the home of siblings Nishawn Green and Demetrius Labon, without a valid search warrant. Then, once the police realized that they were in the wrong place—the dwelling they meant to search was an entirely separate apartment in the same building—they did not retreat from Plaintiffs' home.  Instead, the police treated Demetrius and Nishawn like criminal suspects, holding them up against their own kitchen wall while officers completed their search of the other, separate apartment.

1

2.      This misconduct violated Demetrius and Nishawn's right to be free of unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States constitution, as well as their rights under Illinois common law.

3.      Demetrius and Nishawn bring this action pursuant to 42 U.S.C. § 1983 and the laws of the State of Illinois to redress injuries they suffered as a result of this misconduct.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because the events giving rise to the state law claims form part of the same case and controversy as the claims over which the Court exercises original jurisdiction.

3.      Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this litigation occurred in the Northern District of Illinois.

## PARTIES

5.      Plaintiff Nishawn Green is 24 years old.  At the time of the events in question, she lived with her brother, Demetrius, at 2111 S. Drake Avenue, Apartment 1F, in Chicago.

6.      Plaintiff Demetrius Labon is 22 years old.  At the time of the events in question, he lived with his sister, Nishawn, at 2111 S. Drake Avenue, Apartment 1F.

7.      Defendant BRIAN COLLINS (star # 16773) is a member of the Chicago Police Department.  COLLINS swore out the Complaint for Search Warrant upon which the search warrant at issue in this case was based.  COLLINS was also a member of the police team that executed the search warrant at issue in this case.

2

8.      Defendant ROBERT GARZA (star # 1105) is a member of the Chicago Police Department.  He was the supervising sergeant of the police team that executed the search warrant at issue in this case.

9.      Defendant MICHAEL J. BARZ (star # 727) is a lieutenant of the Chicago Police Department.  He was a supervising officer of the police team that executed the search warrant at issue in this case.

10.     Defendant RYAN STEC (star # 8651) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

11.     Defendant ARNOLDO RIVERA (star # 16152) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

12.     Defendant JOEL SOTO (star # 19351) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

13.     Defendant DANIEL M. COJOCNEAN (star # 15003) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

14.     Defendant MARK R. BRONKE (star # 15695) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

3

15.     Defendant CARLOS R. RUIZ (star # 13526) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

16.     Defendant NICHOLAS E. NUNEZ (star # 13672) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

17.     Defendant MICHAEL T. FIETKO (star # 7513) is a member of the Chicago Police Department.  He was a member of the police team that executed the search warrant at issue in this case.

18.     The CITY OF CHICAGO is an Illinois municipality.  It operates the Chicago Police Department, which employs of all the individual defendants.

**FACTS**

**Layout of 2111 S. Drake Avenue**

19.     2111 S. Drake Avenue is a two-story greystone apartment building in Chicago. The building has five apartments:  one unit (Apartment G) is a garden unit and is the only apartment on the basement/garden level.  The building's first and second floors each have two apartments in a front-rear arrangement, such that the first floor has apartments "1F" and "1R" and the second floor has apartments "2F" and "2R."

20.     The five apartments are accessed through several different entrances.  The front door of the building, facing Drake Avenue, opens onto a small vestibule, which in turn has two other doors.  The door on the left opens onto stairs leading up to Apartment 2F, and is labeled with a "2."  The door on the right is the front door of Apartment 1F, and is also labeled.  The "1" decal has fallen off, but the "F" decal remains, and is clearly visible.

4

21. 2111 S. Drake's garden (G) and rear (1R and 2R) apartments are accessed from a wide gangway running along the south side of the building. There are two doors along the gangway. The first door, down a flight of stairs, is for Apartment G, and is so labeled.

22. The second door, which is halfway down the side of the building and up a flight of stairs, opens to another, side vestibule. This side vestibule in turn has two doors: the back door to Apartment 1F, and the front door to Apartment 1R. The door to Apartment 1R is labeled "1R." (The side vestibule also has stairs leading up to the same arrangement on the second floor: the back door to Apartment 2F and the front door to Apartment 2R.)

23. While doors for Apartments 1F and 1R both open into the side vestibule, the two apartments are entirely separate units. Indeed, as the police search of Apartment 1R would quickly reveal, Apartment 1R's door facing the side vestibule was barricaded with 2x4s.

24. The rear of the building, facing an alley, has a two-story wooden deck-and-stairs arrangement, and has rear doors for apartments G, 1R, and 2R. There are also five electrical meters, one for each apartment, on the rear wall of the building.

25. That 2111 S. Drake has five apartments is made obvious by the five separate mailboxes attached to the building's front fence, along the sidewalk. These mailboxes are variously labeled with apartment numbers and names of tenants, and are plainly visible to any person arriving at the building or passing by on the street or sidewalk. Labels on two of the boxes (to apartments 1F and G) are missing or obscured, but the remaining mailboxes are plainly labeled "2F," "2R," and "1R," in large, reflective lettering.

26. A plaque above 2111 S. Drake's front door prominently displays the name, address, and phone number of Letts Property Management, which manages the building.

5

**Collins obtains search warrant for "[t]he first floor apartment" of 2111 S. Drake**

27.     On February 7 or 8, 2017, COLLINS swore out a Complaint for Search Warrant for "the first floor apartment located at 2111 S. Drake."

28.     In the Complaint for Search Warrant, COLLINS relates that he was told by a "J. Doe" informant that J. Doe had gone to "the back door" of the first floor of 2111 S. Drake, where a man named "Pookie" answered, invited J. Doe into his kitchen just inside the back door, and sold J. Doe illegal drugs there.  (J. Doe had also seen other people come to this back door and apparently buy drugs.)  COLLINS goes on to state that he accompanied J. Doe to 2111 S. Drake, where J. Doe pointed the front and rear of the building and specifically identified the rear door of the first floor of the building, where J. Doe had entered to buy drugs.  The Complaint for Search Warrant also notes that J. Doe identified "Pookie" as a man named Darren Todd, age 45.  The Complaint for Search Warrant sought a search warrant to seize illegal drugs and other items in Pookie's apartment.  The Complaint for Search Warrant does not relate that COLLINS, or anyone else, made any effort to determine how many apartments were in the building, or whether the first floor had more than one apartment.

29.     The Complaint for Search Warrant does not relate any information indicating that "Pookie" or anyone else in the apartment COLLINS proposed to search was armed or that the informant had seen any guns or weapons, and on information and belief COLLINS received no such information.

30.     On the afternoon of February 8, based on the allegations COLLINS made in the Complaint for Search Warrant, a search warrant was issued for the "First floor apartment of a two flat apartment building located at 2111 S. Drake Ave., Chicago, Il, Cook County, 60623."

**Police execute the search warrant on the wrong apartment**

31.     Nishawn and Demetrius reside in Apartment 1F of 2111 S. Drake, which is a three-bedroom apartment.  From the building's front vestibule, Apartment 1F's front door opens into a living room.  From the living room, a hallway leads past the first bedroom, and then to the kitchen.  Doors from the kitchen open onto a bathroom, Demetrius and Nishawn's separate bedrooms, and to Apartment 1F's back door, which, as noted above, opens to the building's side vestibule.

32.     On the evening of February 8, 2017, Demetrius and Nishawn were home in for the evening.  Demetrius was in the kitchen; Nishawn was in her bedroom.  Around 7:30 p.m., Demetrius heard police banging on Apartment 1F's front door, stating "Chicago Police Search Warrant!"

33.     Demetrius began moving towards the front door to answer, but never got past the kitchen threshold.  Less than three seconds after first announcing themselves (*i.e.*, first uttering the word "Chicago"), defendant STEC used his battering ram to break down Apartment 1F's front door.  This was accomplished in less than a second after STEC began hammering the door.

34.     After STEC broke down the front door of Apartment 1F, several officers rushed in.  These included defendants RIVERA, COLLINS, FIETKO, NUNEZ, RUIZ, SOTO, as well as non-defendant officers Nicholas Mukite and Ray Sanjuanero, who are not defendants in this case.

35.     As they entered the apartment, defendant SOTO, who was carrying a riot shield, kicked down the door to the apartment's front bedroom, next to the living room.  This action was entirely unnecessary:  nobody was inside the first bedroom and its door, which locks from the

inside, was unlocked.  Indeed, after kicking the door and damaging it, video shows officer opened the door as you normally would, the knob with his hand.

36.     As they entered the apartment defendant RIVERA, who was in the lead, pointed an AR-15 style assault rifle at Demetrius, screaming at Demetrius to "Put your fucking hands up!" and then seconds later, to get on the ground.  The other members of the entry team had their guns drawn and pointed at Demetrius as well.  Demetrius complied, first raising his hands and then getting face-down on the floor.  (On information and belief, RIVERA used the AR-15 for the execution of the warrant at the direction and with the knowledge and consent of defendants GARZA and/or BARZ.)

37.     The defendants then stepped over Demetrius and entered the kitchen.  Nishawn, wearing her night clothes, had just entered the kitchen from her back bedroom after hearing the commotion.  Pointing guns at Nishawn, including RIVERA's AR-15, the defendants ordered her to the kitchen floor as well.  She complied, and went to her knees on the floor.

38.     Within seconds of entering Apartment 1F, the officers realized that they were in the wrong apartment.  Even as he was getting down on the floor, Demetrius told the officers that they had entered the "wrong door," indicating that they should have gone to Apartment 1R.  The officers quickly swept through Apartment 1F, which was tidy and neatly furnished, realized they were in the wrong dwelling, and stopped searching it.

39.     Upon the realization that they were in the wrong unit—which came seconds after the officers had first entered Apartment 1F—defendants RIVERA, COLLINS, and RUIZ entered the building's side vestibule, and the door to Apartment 1R, which is labeled.  In the vestibule, the three officers began cursing—one, gesturing to the door of Apartment 1R (which was labeled, "1R"), said, "This has got to be it.  Fuck!"

8

40.     RIVERA, COLLINS, and RUIZ then asked the other officers, who were still in Apartment 1F, to get the battering ram so that they could enter Apartment 1R.  Once the battering ram was procured the officers broke down the door to Apartment 1R and entered it to conduct their search in that apartment.

41.     Realizing that they had entered Apartment 1F incorrectly and that the search warrant was really for Apartment 1R, the officers should have immediately vacated Apartment 1F and left Demetrius and Nishawn alone.  And on information and belief, some of the officers—including non-defendant officers Nicholas Mukite and Ray Sanjuanero—did leave Apartment 1F shortly after the police realized they were in the wrong dwelling.

42.     Others, however, did not.  Instead they stayed behind, handcuffed Demetrius, and held Demetrius and Nishawn against their will in their own kitchen; or re-entered the Apartment 1F later, for no legitimate purpose.  These officers included NUNEZ, FIETKO, STEC, and RUIZ.

43.     Meanwhile, a second group of officers had been stationed outside the building during the initial police entry into Apartment 1F, but then entered Apartment 1F later, after all the officers participating in the search warrant knew it was the wrong apartment.  These officers included GARZA, BARZ, BRONKE, and COJOCNEAN.

44.     The conduct described above was recorded on body cameras worn by many of the officers who took part in the execution of the search warrant.  That recorded footage shows the following:

a.      NUNEZ.  Defendant NUNEZ was part of the team that originally entered Apartment 1F, and he is the officer who cuffed Demetrius.  Nunez, however, placed Demetrius in handcuffs *after* the police realized that they were in the wrong apartment

and had already begun trying to enter Apartment 1R. Then, as the police had applied a battering ram to Apartment 1R's door and were preparing to enter Apartment 1R, Nunez pulled Demetrius off the ground by one arm, such that much of Demetrius's body weight was raised by the handcuffs, causing Demetrius needless pain. NUNEZ did not leave Apartment 1F thereafter, nor did he uncuff Demetrius. Instead he remained for several minutes, and, having ordered Nishawn and Demetrius to stand against their kitchen wall, he told defendant COJOCNEAN to "keep an eye on" Plaintiffs while NUNEZ went into Apartment 1R. NUNEZ did not uncuff Demetrius until he returned from Apartment 1R several minutes later. Later on, NUNEZ left Apartment 1R to go to one of the squad cars. Instead walking from Apartment 1R outside along the building's gangway, however, he used Apartment 1F as a shortcut, walking through it to get to the vehicle.

b.      GARZA. Defendant GARZA was the Sergeant in charge of the execution of the search warrant. When police first entered Apartment 1F, GARZA was stationed outside the back of the building, and was in communication with the officers entering Apartment 1F via radio. Less than two minutes after the officers first entered 1F, they radioed Garza to tell him there were two separate apartments. In response Garza can be heard to exclaim, "Oh there are two separate apartments? What the fuck." A minute later Garza entered the building through the side vestibule, walked past the open door of Apartment 1R, and poked his head into the back door of Apartment 1F, observing, "Yeah, this is separate." There were at least four officers inside of Apartment 1F at this time, but GARZA did not tell any of them to leave. Instead, he left Apartment 1F for Apartment 1R, and busied himself with the search of that apartment. He re-entered Apartment 1F

10

more than 20 minutes later, only after the search of Apartment 1R was substantially

complete.  Only then did he give Nishawn and Demetrius permission to close their doors.

c.      BRONKE.  Like GARZA, defendant BRONKE was stationed outside during the

initial entry into Apartment 1F.  On information and belief, he heard the same

transmission as GARZA, and could hear GARZA exclaim, "Oh there are two separate

apartments?  What the fuck."  Moments later, while still outside the building, BRONKE

informed COJOCNEAN, "Apparently there's two separate apartments."  Despite this, a

short time later BRONKE walked in and out of Apartment 1F several times, assisting

other officers in obliging Nishawn and Demetrius to remain against their kitchen wall.

d.      COJOCNEAN.  Defendant COJOCNEAN was also stationed outside during the

initial entry into Apartment 1F.  Several minutes after police first entered Apartment 1F,

BRONKE informed COJOCNEAN, "Apparently there's two separate apartments."

Despite this information, moments later, COJOCNEAN walked into the open front door

of Apartment 1F, which was clearly the "other" apartment.  Working with other

defendants, including NUNEZ, COJOCNEAN then continued holding Demetrius and

Nishawn up against their kitchen wall.  He did this even though Demetrius and Nishawn

were in thin clothing on a cold winter night, and the police had left both the front and

back doors to Apartment 1F open.  At one point Demetrius complained about the cold,

but COJOCNEAN and the other defendants, who were all in warm clothes, made no

effort to help him.

e.      BARZ. Defendant BARZ entered Apartment 1F after the entry team, and he

remained there long after other officers in BARZ's presence—including GARZA—had

observed that it was a separate apartment that was plainly not the subject of the search

11

warrant. During that time BARZ assisted in keeping Demetrius and Nishawn against their kitchen wall. He also walked into different rooms of Apartment 1F. BARZ is a lieutenant, but at no point did he order any of the other officers in Apartment 1F to retreat from it.

f.  FIETKO. Officer FIETKO was among the officers who originally entered Apartment 1F. He did not leave Apartment 1F immediately after the police realized they were in the wrong place. Instead he remained in the apartment for several minutes, loitering in the kitchen and peering into closets, even after officers had broken down the door to Apartment 1R and begun conducting their search there.

g.  RUIZ. Officer RUIZ was among the officers who originally entered Apartment 1F. He initially left Apartment 1F for Apartment 1R soon after the police realized they were in the wrong place, but then re- entered Apartment 1F for no legitimate purpose, and remained there for several minutes.

h.  STEC. Officer STEC, who was part of the police entry team into Apartment 1F, originally left Apartment 1F as part of the officers' initial entry into Apartment 1R. Several minutes later, however, STEC entered Apartment 1F at least twice, after the officers knew it was not a target of the search.

45.  As summarized above, at the direction and with the knowledge and consent of GARZA and/or BARZ, multiple police officers entered, walked through, or stayed in Apartment 1F, ordering Nishawn and Demetrius to remain against their kitchen wall and holding them there, against their will.

46.  Throughout this time, the siblings asked the officers defendant to explain why the police were in their home, and demanded to be provided with a copy of any search warrant that

12

justified their presence in the home. The defendants did not respond, and did not produce a search warrant.

47. Around half an hour after first entering Apartment 1F, the police were concluding their search of Apartment 1R. Only then did they also leave Apartment 1F, and allow Demetrius and Nishawn off the kitchen wall. The defendants never presented the siblings with a search warrant or any other documentation of the raid. They did not charge either Demetrius or Nishawn with any crime, suggest that they had ever been suspected of criminal activity, or suggest that they had ever been lawfully detained.

48. The Plaintiffs suffered damages as a result of the search. The front door to Apartment 1F was damaged, as was the door to the front bedroom. The defendants made no effort to repair what they had broken. Living in an apartment that had been damaged in this way was humiliating for Nishawn and Demetrius.

49. The defendants' conduct of the raid was also emotionally damaging. Demetrius and Nishawn were in the sanctuary of their home for the evening when heavily armed, shouting men burst into their home and pointed an assault rifle in their faces. Such an event is terrifying enough on its own; it also placed Demetrius and Nishawn in reasonable fear that they might be killed if they made any inadvertent move that the defendants misinterpreted as threatening.

50. The event was particularly traumatizing because Demetrius and Nishawn have been victims of gun violence. Their mother was murdered several years ago, when the siblings were teenagers; Nishawn was the one who found her mother's body, shot to death in a car. Being threatened by armed men at gunpoint during the unlawful entry and search of their home was traumatizing and emotionally damaging to both Demetrius and Nishawn.

51.     Demetrius and Nishawn were also humiliated by the invasion into their home, as well as by having strangers in their home who forced them to lie on their own floor and then to get up against their own kitchen wall, for no reason.

52.     Nishawn in particular was humiliated by being forced to stand in front of male strangers in her nightclothes in her own home.

53.     Demetrius was handcuffed *after* the police realized they were in the wrong apartment, and then was pulled up by the handcuffs shortly later, when police were entering Apartment 1R, the unit they meant to search.  He was not unhandcuffed for several more minutes.  His handcuffing—and the failure to uncuff him promptly—was entirely unnecessary and unjustified.

54.     At the time of the execution of the search warrant, the temperature in Chicago was 21° F, and because of the humidity it felt even colder, with a wind chill of 10° F.  Nishawn was in thin night clothes, and Demetrius was in a tank top.  Yet the defendants—who were all warmly clad—did not close the doors to Apartment 1F during their entire occupation of the unit, nor did they allow Nishawn or Demetrius to put on warmer clothes.  The defendants' body camera videos show that Demetrius and Nishawn were uncomfortable during the search, with both visibly hugging themselves in an effort to stay warm.  The cold temperature caused Nishawn and Demetrius significant, needless pain.

55.     After the police eventually left 2111 S. Drake, Demetrius and Nishawn's front door remained badly damaged from being knocked in by defendant STEC, and could not be closed properly.  As a result, Demetrius and Nishawn had to live in a home without a properly-closing front door in North Lawndale, one of the most dangerous and crime-plagued

neighborhoods in Chicago. Left with essentially no defense against intruders, Demetrius and Nishawn were left in significant fear for their safety.

56.     The individual defendants' acts and omissions described herein were objectively unreasonable. They were also willful, wanton, malicious, oppressive, and done with reckless indifference and callous disregard for the rights of others, and justify the awarding of exemplary and punitive damages.

57.     In all the acts and omissions described herein, the individual defendants were acting within the scope of their employment for their employer, defendant the CITY OF CHICAGO.

## COUNT I

### 42 U.S.C. § 1983 - Invalid Warrant

58.     Each paragraph of this complaint is incorporated as if fully restated here.

59.     Before setting in motion a dangerous and terrifying militarized police raid, COLLINS had a duty to discover whether he was identifying the right place to be searched, and not the dwelling of some innocent third party. He utterly failed to do this, resulting in precisely the kind of invasion of Demetrius and Nishawn's home that the Fourth Amendment is designed to prevent.

60.     When he swore out the Complaint for Search Warrant, COLLINS knew or should have known that there was more than one unit on the first floor of 2111 S. Drake, and that there was only probable cause to believe that the *rear* first floor unit, Apartment 1R, could be a proper target for any search.

61.     The information that COLLINS received from the J. Doe informant provided no information about whether or not the first floor of 2111 S. Drake contained more than one unit.

15

Rather, J. Doe indicated only that he or she had entered "Pookie's" apartment from the building's rear, and that he or she had only entered the apartment as far as the kitchen, which was immediately inside the rear door. J. Doe thus provided no meaningful information regarding whether the building's entire first floor was made up only of one unit, or more. The limited nature of the information provided by the J. Doe informant should have prompted COLLINS to make further efforts to determine how many apartments were contained on the building's first floor.

62.     Furthermore, even a passing view of the front of the building (which COLLINS stated in the Complaint for Search Warrant that he had seen) would have alerted a reasonable person that the first floor contained more than one unit. The mailboxes for 2111 S. Drake are clearly visible from the street and sidewalk, and there are five such mailboxes, indicating five apartments. The labeling of the "1R" mailbox, the "2F" and "2R" mailboxes, and the existence of the two additional unlabeled mailboxes, should have made it obvious to COLLINS that there were multiple units on each floor, and that in particular the first floor of the building, which evidently had a "rear" (*i.e.*, "1R") apartment, contained more than one unit. At a minimum, the mailboxes should have alerted COLLINS that he needed to determine whether the first floor of 2111 S. Drake contained one unit, or more.

63.     Likewise, the presence of five utility meters on the rear of the two-story building—which COLLINS also stated he had surveilled with the J. Doe informant—should also have alerted COLLINS that he needed to take some step to discover how many apartments were on the first floor, rather than simply assuming there was only one.

64.     Such an inquiry would have been easy for COLLINS to make. For one thing the "1R" mailbox was there for all to see, and in light of the information provided by J. Doe, it

indicated that Pookie lived in an Apartment 1R, i.e., a unit in the rear—not the front—of the first floor. For another, if COLLINS had bothered to contact Letts Property Management, whose name, phone number, and contact information are prominently displayed above the building's front entrance, he would have learned that there were indeed two units on the building's first floor. In the same manner, COLLINS also could have contacted the utility companies and learned that there were two units on the first floor. Furthermore, the Chicago Police Department subscribes to information sources, like Accurint, that help officers identify apartments and persons residing in them. Had COLLINS bothered to use such sources of information, he would have learned that 2111 S. Drake has two units on the first floor.

65. COLLINS did not conduct any such investigation, however, or cause one to be conducted.

66. Given the information available to him at the time he swore out the Complaint for Search Warrant, COLLINS either knew or should have known that the first floor of 2111 S. Drake contained more than one unit, and he should have disclosed that information to the magistrate issuing the search warrant. He failed do this, however.

67. COLLINS's failure to discover and disclose that the first floor contained more than one unit was either intentional or reckless, and as a result the magistrate was misled into believing that there was probable cause to search the entire first floor of 2111 S. Drake, when in fact there was not.

68. As a result, the February 8, 2017 warrant to search "the first floor" of 2111 S. Drake was invalid when it was issued. There was no valid warrant to search Apartment 1F, and the search of that apartment was not conducted pursuant to a valid warrant.

69.     COLLINS's acts and omissions were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others. They justify the awarding of exemplary and punitive damages.

70.     On information and belief, COLLINS's shoddy and inadequate investigation was conducted at the direction and with the knowledge and consent of GARZA and/or BARZ.

71.     By reason of these acts and omissions, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and they suffered damages to their property, emotional injuries, and humiliation, as described in this complaint.  Therefore COLLINS and GARZA and/or BARZ are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

## COUNT II

### 42 U.S.C. § 1983 – Unreasonable Search – Knock-and-Announce

72.     Each paragraph of this complaint is incorporated as if fully restated here.

73.     Defendant STEC waited less than three seconds from the time the officers first announced their identities and intentions before breaking down the front door to Apartment 1F—with the announcement of "Chicago Police, search warrant!" coming within those three seconds.

74.     At the time STEC applied the battering ram to the front door of Apartment 1F, there was no indication that the occupants of the unit would deny the police entry, or that they were attempting to destroy the drugs that were the target of the search.

75.     STEC did not wait a reasonable amount of time to determine whether the police were being refused admission to Apartment 1F before breaking down its door.

76.     If STEC had waited a reasonable amount of time before breaking down the front door of Apartment 1F, Demetrius, who had started moving from the kitchen to answer the front

door, would have answered it, avoiding any need to break down the door and the violent entry that followed.

77.     After STEC broke down Apartment 1F's front door, he and the defendant officers on the entry team, including RIVERA, COLLINS, FIETKO, NUNEZ, RUIZ, and SOTO, entered the apartment immediately, yelling with guns drawn.  This entry was unreasonable for the same reason, that the officers did not wait a reasonable time after announcing their presence to enter Apartment 1F.  Had they waited a reasonable time they would have been granted entry by Demetrius, who had started moving to the front door when it was broken down and the officers entered.

78.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

79.     By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and they suffered humiliation and emotional injuries, which are described elsewhere in this complaint.

80.     Therefore defendants STEC, RIVERA, COLLINS, FIETKO, NUNEZ, RUIZ, and SOTO are liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for unreasonable entry and search under the Fourth Amendment.

## COUNT III

### 42 U.S.C. § 1983 – Fourth Amendment - Excessive Force

81.     Each paragraph of this complaint is incorporated as if fully restated here.

82.     Defendant RIVERA employed excessive force in using an AR-15 rifle in the raid. The defendants had no indication that anyone in the apartment was armed, and the use of the RIVERA's assault weapon, along with the violent, swat-style entry into the apartment, was unnecessary and unreasonable under the circumstances.  Defendants GARZA and/or BARZ knew of, directed, and gave consent to RIVERA to use the AR-15 in the execution of the warrant.

83.     As a result of the unreasonable conduct of defendants RIVERA and GARZA and/or BARZ, Demetrius and Nishawn were needlessly subject to a terrifying, paramilitary-style raid.

84.     Defendant NUNEZ employed excessive and unreasonable force in handcuffing Demetrius *after* the police had realized they were in the wrong apartment; in then lifting Demetrius up in a manner that much of his body's weight rested on the handcuffs while the police were entering Apartment 1R; and in failing to uncuff Demetrius for several minutes.

85.     Defendant SOTO employed excessive force in kicking and damaging the door to the front bedroom unnecessarily and in an unreasonable manner.

86.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

87.     By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and they suffered pain, humiliation and emotional injuries, which are described elsewhere in this complaint.

88.     Therefore defendants RIVERA, NUNEZ, SOTO, and GARZA and/or BARZ are liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for use of unreasonable and excessive force under the Fourth and Fourteenth Amendments.

## COUNT IV

**42 U.S.C. § 1983 - Failure to Retreat from Apartment 1F and Unreasonable Seizure**

89.     Each paragraph of this complaint is incorporated as if fully restated here.

90.     As soon as they knew or should have known that Apartment 1F and Apartment 1R were separate units and that they did not have a warrant to enter or search Apartment 1F, each police officer participating in the execution of the search warrant should have retreated from Apartment 1F immediately, and left Demetrius and Nishawn alone.

91.     Some officers, including non-defendants Mukite and Sanjuanero, did so retreat.

92.     Numerous defendant officers did not, however.  Instead, at the direction and with the knowledge and consent of GARZA and/or BARZ, numerous officers entered (or did not immediately retreat from) Apartment 1F, and assisted each other in forcing Demetrius and Nishawn to remain up against the wall of their own kitchen, for the duration of the defendants' search of an entirely *separate* unit, Apartment 1R.  These officers included NUNEZ, FIETKO, STEC, RUIZ, GARZA, BARZ, BRONKE, and COJOCNEAN.

93.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

94.     By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth

Amendments to the U.S. Constitution, and they suffered humiliation and emotional injuries, which are described elsewhere in this complaint.

95.     Therefore defendants NUNEZ, FIETKO, STEC, RUIZ, GARZA, BARZ, BRONKE, and COJOCNEAN are liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments.

## COUNT V

### 42 U.S.C. § 1983 - Failure to Intervene

96.     Each paragraph of this complaint is incorporated as if fully restated here.

97.     In the manner described above, during the constitutional violations described herein, each of the officer defendants—NUNEZ, FIETKO, STEC, RUIZ, GARZA, BARZ, BRONKE, RIVERA, COLLINS, and COJOCNEAN—stood by without intervening to prevent the violation of the Plaintiffs' constitutional rights, even though they had an opportunity to do so.

98.     As a result of the individual defendants' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs suffered property damage, emotional injury, and humiliation. The individual defendants had ample, reasonable opportunities to prevent this harm, but failed to do so.

99.     The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

100.    By reason of the acts and omissions of the defendant officers, Plaintiffs were deprived of the rights, privileges, and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution. Therefore defendants NUNEZ, FIETKO, STEC, RUIZ,

GARZA, BARZ, BRONKE, RIVERA, COLLINS, and COJOCNEAN are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

## COUNT V

### State Law – Trespass

101. Each paragraph of this complaint is incorporated as if fully restated here.

102. Plaintiffs had a possessory right to Apartment 1F, including the right to exclude entry by others.

103. Defendants NUNEZ, FIETKO, STEC, RUIZ, GARZA, BARZ, BRONKE, and COJOCNEAN intentionally made unauthorized entry, without permission, into Apartment 1F.

104. The individual defendants also conspired and agreed to intentionally remain in Apartment 1F, without authorization, and each of them did do so.

105. The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

106. All of the defendants committed these tortious acts and omissions in the course of their employment by defendant CITY OF CHICAGO, and the CITY OF CHICAGO is therefore liable for their acts under the doctrine of *respondeat superior*.

107. Plaintiffs suffered injuries as a result of the trespass, as described elsewhere in this complaint.

## COUNT VI

### State Law - False Imprisonment

108. Each paragraph of this complaint is incorporated as if fully restated here.

109.    As described more fully herein, defendants NUNEZ, FIETKO, STEC, RUIZ, GARZA, BARZ, BRONKE, and COJOCNEAN intentionally confined Nishawn and Demetrius, without authority, to boundaries not of the Plaintiffs' choosing.

110.    Demetrius and Nishawn did not consent to these restraints.  Rather they were impelled by the defendants' show of unfounded assertion of authority and implicit threat of violence.

111.    Demetrius and Nishawn were conscious of the confinement and were harmed by it, as described elsewhere in this complaint.

112.    The defendants' acts and omissions directly and indirectly resulted in the Plaintiffs' confinement.

113.    The acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

114.    All of the defendants committed these tortious acts and omissions in the course of their employment by defendant CITY OF CHICAGO, and the CITY OF CHICAGO is therefore liable for their acts under the doctrine of *respondeat superior*.

## COUNT VII

### State Law – Battery

115.    Each paragraph of this complaint is incorporated as if fully restated here.

116.    In handcuffing Demetrius after the police realized that they were in the wrong apartment, NUNEZ did a willful and intentional act, intended to cause unpermitted touching of Demetrius by both NUNES himself and by the handcuffs.  This battery continued until the handcuffs were removed.

24

117.    In lifting Demetrius up without uncuffing him as the police entered Apartment 1R, NUNEZ did a willful and intentional act, intended to cause unpermitted touching of Demetrius by NUNEZ himself and by the handcuffs.

118.    NUNEZ's acts and omissions described herein were objectively unreasonable and were undertaken intentionally, with malice, and with reckless indifference to the rights of others, and justify the awarding of exemplary and punitive damages.

119.    NUNEZ committed these tortious acts and omissions in the course of his employment by defendant CITY OF CHICAGO, and the CITY OF CHICAGO is therefore liable for their acts under the doctrine of *respondeat superior*.

120.    Demetrius suffered injuries as a result of the trespass, as described elsewhere in this complaint.

## COUNT VIII

### State Law – *Respondeat Superior*

121.    Each paragraph of this complaint is incorporated as if fully restated here.

122.    While engaging in the conduct described herein, the individual defendants were employees of the CITY OF CHICAGO, acting at all times within the scope of their employment.

123.    The CITY OF CHICAGO is liable as principal for torts committed by its agents.

## COUNT IX

### State Law – Indemnification

124.    Each paragraph of this complaint is incorporated as if fully restated here.

125.    Illinois law provides that public entities are directed to pay any judgment for compensatory damages for which employees are liable within the scope of their employment activities.

126. All the individual defendant officers were employees of the CITY OF CHICAGO, acting at all relevant times within the scope of their employment in committing the misconduct described herein

**WHEREFORE**, Plaintiffs Nishawn Green and Demetrius Labon respectfully request that this Court enter a judgment in their favor and against defendants COLLINS, GARZA, STEC, RIVERA, SOTO, NUNEZ, FIETKO, STEC, BARZ, BRONKE, COJOCNEAN, and the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each defendant, punitive damages against each of the individual defendants, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs Nishawn Green and Demetrius Labon hereby demand a trial by jury on all issues so triable.

**Nishawn Green**
**Demetrius Labon**

Dated: November 21, 2017

By: /s/ Stephen H. Weil
*One of Plaintiffs' attorneys*

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Ave.
Suite 2700
Chicago, IL 60604
(312) 585-7404

*Attorneys for Plaintiffs Nishawn Green and Demetrius Labon*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2017, a true and correct copy of the foregoing was filed electronically.  Notice of this filing is sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

/s/ Stephen H. Weil